UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CARLOS ROMERO,

                        Petitioner,

            -against-

MICHAEL SHEAHAN, Superintendent Five Points
Correctional Facility,

                        Respondent.
--------------------------------------------------------------X

**FILED**
**CLERK**
6/21/2016 11:57 am
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**ORDER**
13-cv-4048 (SJF)

FEUERSTEIN, District Judge:

Petitioner Carlos Romero ("Romero") brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction on one (1) count of first-degree robbery.   (Petition for Writ of Habeas Corpus ("Pet.") (Dkt. 1)).   Romero asserts the following grounds for relief: (1) ineffective assistance of trial counsel; (2) insufficient evidence supporting his conviction; (3) the trial court committed reversible error when it failed to provide an *Allen* charge to the jury; (4) the trial court committed reversible error when it provided the jury with a "consciousness of guilt" instruction; and (5) his twenty (20)-year sentence is harsh and excessive.   For the following reasons, Romero's petition is denied in its entirety.

I.      **BACKGROUND**

        A.      **Facts Adduced at Trial**

                1.      **Alan Menjivar Drove Romero to the Scene of the Robbery**

        On February 1, 2009, at a deli in Brentwood, New York, Romero asked Alan Menjivar, an acquaintance from the neighborhood, for a ride to the New Brent City shopping center so that Romero could collect money that was owed to him.   (December 11, 2009 Trial Transcript (Dkt.

1

8-7) ("12/11 Tr.") at 5-10).    Romero offered Mr. Menjivar ten dollars ($10) in exchange for the

ride, and Mr. Menjivar drove him there.    (*Id.* at 7).    When they arrived at the shopping center,

Mr. Menjivar let Romero out of the car, then found a parking spot and parked the car.    (*Id.* at 9).

Mr. Menjivar went into a Family Dollar store while he was waiting for Romero to return to the

car.    (*Id.*).    After spending three (3) to five (5) minutes inside the Family Dollar store, Mr.

Menjivar exited and saw police officers surrounding his car.    (*Id.* at 12).    Mr. Menjivar

approached the officers to find out what was happening, and the officers told him that he needed

to go to the police precinct to give a statement.    (*Id.*).

At approximately 4:00 or 5:00 p.m. that day, Mr. Menjivar went to the precinct and told

the officers that he had given Romero a ride to the shopping center, and then a police officer

drove him home.    (*Id.* at 12-13).    Soon after being dropped off at home, Mr. Menjivar returned

to the same deli at which he had met Romero earlier in the day, where he again encountered

Romero.    (*Id.* at 13-15).    Mr. Menjivar asked Romero why Romero had gotten him involved in

this situation and why Mr. Menjivar had to spend two (2) or (3) hours at the police precinct, and

Romero left the deli without responding.    (*Id.* at 15, 35).    Mr. Menjivar did not call the police to

report that he had seen Romero.    (*Id.* at 35-36).

## 2.    The Robbery and its Witnesses

On February 1, 2009, Carolina Savion was working as a waitress at Mi Ranchito, a

Colombian restaurant in the New Brent City shopping center, and Judith Contreras was working

behind the counter.    (December 10, 2009 Trial Transcript (Dkt. 8-2) ("12/10 Tr.") at 73-74;

December 14-18, 2009 Trial Transcript (Dkt. 8-4) ("12/14 – 12/18 Tr.") at 243-246).    Just

before 4:00 p.m., an Hispanic man who was approximately six feet (6' 00") tall and wearing a

dark blue jacket, a scarf, a hat, and sunglasses entered the Mi Ranchito restaurant.    (12/10 Tr. at

75-80, 86-87; 12/14-12/18 Tr. at 245-46).   Ms. Contreras was standing behind the cash register at the front of the restaurant and Ms. Savion was standing nearby.   (12/10 Tr. at 79-80; 12/14-12/18 Tr. at 245-46).   The man stood next to Ms. Savion and in front of Ms. Contreras and demanded, in Colombian-accented Spanish, that Ms. Contreras give him all of the money in the cash register.   (12/10 Tr. at 79-82, 85-86; 12/14-12/18 Tr. at 247-48).   When the women hesitated, the man displayed a black handgun and said, "I'm not playing.   If you don't give me what I want, I'm going to shoot you." (12/10 Tr. at 80-82; 12/14-12/18 Tr. at 247-48).   The gun looked real to the women, and Ms. Contreras testified that the man "did something with the weapon, like if he loaded it … like in the movies when people take the gun and do like this and make that sound."   (12/10 Tr. at 80-81; 12/14-12/18 Tr. at 247-50).   After Ms. Contreras saw the man make this motion with the gun, she gave him between one hundred dollars ($100) and one hundred twenty dollars ($120) from the cash register, and the man walked out of Mi Ranchito toward the Family Dollar store.   (12/10 Tr. at 82; 12/14-12/18 Tr. at 248-51).   After the perpetrator walked out of the restaurant, Ms. Savion and Ms. Contreras saw a male customer who had come to the restaurant with his wife and small child (Alex Leon, discussed below) follow the perpetrator out of the restaurant and Ms. Contreras called 911.   (12/10 Tr. at 82-83; 12/14-12/18 Tr. at 250-51).   Ms. Contreras then spoke with Detective Tullio Serrata in person. (12/14-12/18 Tr. at 251).

While the robbery was taking place, Diana Figueroa and her husband, Alex Leon, were dining at Mi Ranchito with their young daughter, sitting near the cash register, and Ms. Figueroa witnessed the exchange between the perpetrator and the two women.   (12/14 Tr. at 5-10). Noticing that the perpetrator had a gun, Ms. Figueroa got up from her seat and took her daughter to the back of the restaurant.   (*Id.* at 8-9).   Ms. Figueroa testified that she had an opportunity to

see the perpetrator's face, and she identified Romero as the perpetrator in court.   (*Id.* at 10-11).

Mr. Leon followed the perpetrator out of the Mi Ranchito restaurant into the shopping center

parking lot and saw the perpetrator get into Mr. Menjivar's car.   (*Id.* at 37-41).   After spending

a few seconds in the car, the perpetrator got out and walked towards another restaurant in the

vicinity called Mi Tierrita.   (*Id.* at 41-42).   Mr. Leon saw the perpetrator walk into Mi Tierrita.

(*Id.* at 42).   Mr. Leon waited a few seconds and then walked into Mi Tierrita himself, but did not

see the perpetrator inside, so he returned to Mi Ranchito and spoke with the police about what he

had witnessed.   (*Id.* at 42, 58-60).

### 3.    The Police Response and Romero's Confession

On February 1, 2009 at approximately 3:56 p.m., police officer John Williams and his

partner were on patrol in a marked police car when they received a radio dispatch directing them

to respond to the Mi Ranchito robbery.   (12/11 Tr. at 49-50).   A minute or two (2) later, Officer

Williams and his partner arrived at the scene.   (*Id.* at 50-51).   Upon arrival, Alex Leon

approached the officers and told them that he had followed the perpetrator out of Mi Ranchito

and had seen him get into Mr. Menjivar's car.   (*Id.* at 51-52).   Officer Williams secured the car,

which was still parked in the lot near the Family Dollar store.   (*Id.* at 52-54).

When Detective Tullio Serrata arrived at the police precinct for his 5:00 p.m. to 1:00 a.m.

shift on February 1, 2009, he was advised of the Mi Ranchito robbery and directed to investigate

it.   (12/14-12/18 Tr. at 85-86).   At approximately 5:20 p.m., Detective Serrata arrived at the

scene, where he interviewed witnesses, spoke with police officers, and took pictures.   (*Id.* at 86-

87, 89-90, 94-99).   Detective Serrata recovered a hat from the front passenger seat of Mr.

Menjivar's car.   (*Id.* at 101).   Based on information he had received from Mr. Leon, Detective

Serrata then went to the Mi Tierrita restaurant and viewed the restaurant's surveillance video

from that day. (*Id.* at 102-03). Detective Serrata rewound the surveillance tape, paused the video when he located the suspect (just before the video showed Mr. Leon entering the restaurant), and took a picture of the suspect's image on the restaurant's monitor, which was entered into evidence. (*Id.* at 102-08).

At approximately 7:00 p.m., Officer Williams left the New Brent City shopping center and returned to the police precinct, where he spoke about the Mi Ranchito robbery with detectives. (12/11 Tr. at 56-57). Based upon the information he received from the detectives, Officer Williams left the precinct to find Romero. (*Id.* at 57-58). At 8:40 p.m., Officer Williams located Romero at a laundromat near the deli at which Mr. Menjivar had twice seen Romero that day. (*Id.* at 58). When Officer Williams told Romero that he was there to discuss the robbery, Romero said he had been in the laundromat all day. (*Id.* at 59). Officer Williams placed Romero in custody and transported him to the police precinct. (*Id.*).

Detective Serrata returned to the police precinct and spoke with Romero at approximately 9:45 p.m. (12/14-12/18 Tr. at 110-12). Detective Serrata introduced himself and explained to Romero that he was under arrest for the Mi Ranchito robbery and that he (Serrata) had been assigned to speak with Romero about the robbery. (*Id.* at 112). Upon Romero's request, Detective Serrata spoke in Spanish (in which he is fluent) rather than English. (*Id.* at 112-13). Detective Serrata read Romero his *Miranda* rights. (*Id.* at 115-18). Romero waived his rights and agreed to speak with Detective Serrata without an attorney, and proceeded to describe the day's events to Detective Serrata. (*Id.* at 118-24).

During his interview with Detective Serrata, Romero admitted to the Mi Ranchito robbery, explaining that he was unemployed and needed money. (*Id.* at 123-24). Romero told Detective Serrata that he had used an air gun that looked like a real handgun to carry out the robbery. (*Id.*

at 124).   Romero said that he had discarded the gun on Perry Street in Brentwood after the robbery.   (*Id.*).   Romero signed a written statement in which he, *inter alia*, admitted to robbing Mi Ranchito with a "black airgun that looked like a real gun."   (*Id.* at 131-35).

At approximately 11:30 p.m., Romero accompanied Detective Serrata and two (2) other detectives to the location he claimed to have discarded the gun, but they did not find it.   (*Id.* at 150-51).   They then returned to the precinct, where Detective Serrata showed Romero the hat he had retrieved from the front passenger seat of Mr. Menjivar's car and asked Romero if he recognized it.   (*Id.* at 152-53).   Romero admitted that he had worn this hat while robbing Mi Ranchito.   (*Id.* at 153).

### B.    The Purportedly Problematic Jury Instructions and the Jury's Verdict

### 1.    The "Consciousness of Guilt" Instruction

On December 16, 2009, after closing arguments, the Honorable Gary J. Weber, the Suffolk County Court judge presiding over Romero's trial, instructed the jury, *inter alia*:

> In this case the People contend that it was Carlos Romero who fled from Mi Ranchito restaurant to a car, that Carlos Romero then fled from that car to a second restaurant, Mi Tierrita, and that such conduct demonstrates consciousness of guilt.
>
> You must decide first, whether you believe that it was Carlos Romero who did this, and second, if it did take place, whether it demonstrates a consciousness of guilt on the part of the defendant.
>
> In determining whether conduct demonstrates a consciousness of guilt, you must consider whether the conduct has an innocent explanation.   Common experience teaches that even an innocent person who finds himself or herself under suspicion may resort to conduct which gives the appearance of guilt.
>
> The weight and importance you give to evidence offered to show consciousness of guilt depends on the facts of the case.

Sometimes such evidence is only of slight value, and standing
alone, it may never be the basis for a finding of guilt.

(*Id.* at 316-17).

## 2. Judge Weber's Response to a Note from the Jury and the Verdict

On December 17, 2009, after a day and a half of deliberating, the jurors submitted a note

to Judge Weber asking "what happens if we can't reach an agreement." (*Id.* at 349). After

previewing his intended response to that note with both prosecution and defense counsel and

receiving their affirmation, Judge Weber said the following to the jurors:

> I have the note, and basically, what happens if we can't make,
> reach an agreement.
>
> And let me just say this. And I won't get into it too deeply at this
> point. But you have been in deliberations really a very very short
> period of time, as these things go, a very very short period of time.
>
> The key to it is you have got to keep re-analyzing this and taking
> into account each others views. You are a long way from the time
> there, it is impossible to reach a verdict in this case, I would say,
> so, it is just very very early.
>
> If there are some specific things that I can help you with, we can
> do that but I just think it is very very early to come to this
> conclusion.
>
> And by the way, I have been here now, I used to be the newest
> guy, time has passed so quick, I think I am now the senior guy but
> I have had this before and all but one of them have reached
> conclusions. So it is just an analytical thing that you have to go
> through between you. As I say, we are here to help you with it in
> any way we can, so we will…

(*Id.* at 350-51).

On December 18, 2009, the jury found Romero guilty of first degree robbery. (*Id.* at

363-66). On January 14, 2010, at the sentencing hearing, the prosecution, citing Romero's

criminal history and apparent lack of remorse for the robbery, requested the statutory maximum

sentence of twenty-five (25) years. (January 14, 2010 Trial Transcript (Dkt. 8-9) ("1/14 Tr.") at

2-6). Daniel Russo, Esq., Romero's trial attorney, citing the largely nonviolent nature of

Romero's criminal background, requested the statutory minimum sentence of eight (8) years.

(*Id.* at 6-11). Judge Weber sentenced Romero to twenty (20) years with five (5) years of post-

release supervision. (*Id.* at 14).

### C. Direct Appeal

Romero, represented by new counsel, Robert C. Mitchell, Esq., appealed his judgment of

conviction to the New York Supreme Court, Appellate Division, Second Department. (Pet. at

2). Romero's new appellate counsel filed an appellate brief (Appellant's Brief, dated January

18, 2012 (Dkt. 8-11) ("App. Br.")), and then Romero himself filed a supplemental brief *pro se*

(Pro Se Supplemental Brief, dated June 8, 2012 (Dkt. 8-12) ("Pro Se Br.")). On appeal, Romero

argued:

1. that he was denied effective assistance of counsel due to his trial attorney's failure to:

   a. request that the jury be instructed on the affirmative defense that the gun Romero displayed during the robbery was not a loaded weapon capable of producing death or other serious physical injury (App. Br. at 14-19);

   b. request the lesser-included charge of second degree robbery or consult with Romero before making that decision (Pro Se Br. at 4-9);

   c. preserve a claim of evidentiary insufficiency (*Id*. at 9-11);

   d. object to the trial court's allegedly "coercive" comments in response to the jury's note posing the question of "what happens if we can't reach an agreement" (*Id.* at 11);

   e. object to the trial court's "consciousness of guilt" instruction (*Id.* at 12); and

   f. object to the "overtly vindictive" sentence (*Id.*);

8

2. that his conviction should be reversed because the State failed to prove him guilty of first degree robbery beyond a reasonable doubt, or alternatively that his conviction should be downwardly modified to second degree robbery (App. Br. at 20-23);

3. that the trial court committed reversible error by failing to provide the jury with an *Allen* charge in response to the jurors' note and conveying to the jury that it was obligated to return with a verdict (*Id.* at 24-28);

4. that the trial court committed reversible error when it provided the jury with a "consciousness of guilt" instruction (*Id.* at 29-33); and

5. that his twenty (20)-year sentence was harsh and excessive (*Id.* at 34-38).

On December 12, 2012, the Appellate Division affirmed Romero's conviction. *People v. Romero*, 101 A.D. 3d 906 (2d Dep't 2012). With respect to Romero's claim of ineffective assistance of counsel, the Appellate Division held: (i) that "it is not evident from the matter appearing on the record that [Romero] was deprived of the effective assistance of counsel, and (ii) "[s]ince [Romero's] claim of ineffective assistance cannot be resolved without reference to matter outside the record, a CPL 440.10 proceeding is the appropriate forum for reviewing the claim in its entirety." *Id.* at 907 (internal citations omitted). The Court held that Romero's argument of insufficiency of the evidence was unpreserved for appellate review, but that in any event the evidence "was legally sufficient to establish [Romero's] guilt beyond a reasonable doubt," and "upon our independent review pursuant to CPL 470.15 (5), we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id.* at 906 (internal citations omitted). The Court held that Romero's *Allen* charge argument was also unpreserved, but that "[i]n any event, an *Allen* charge was not necessary under the circumstances." *Id.* The Court also held that Romero's argument that the sentence imposed by the trial court "improperly penalized him for exercising his right to a jury trial" was unpreserved for appellate review, but that "[i]n any event, the contention is without merit [because] [t]he fact that the sentence

imposed after trial was greater than the sentence offered during plea negotiations is not, standing alone, an indication that the defendant was punished for asserting his right to proceed to trial… [and] the sentence imposed was not excessive." *Id.* (internal citations omitted). Finally, the Appellate Division held that Romero's "remaining contentions are unpreserved for appellate review … and, in any event, without merit." *Id.*

On March 21, 2013, Romero was denied leave to appeal to the New York Court of Appeals. *People v. Romero*, 20 N.Y.3d 1103 (N.Y. 2013). Romero never moved to vacate his judgment in the state trial court pursuant to CPL § 440.10. (Pet. at 4, ¶ 20).

### D. § 2254 Petition

On July 12, 2013, Romero, proceeding *pro se*, filed the present petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Romero raises the same arguments in his petition that he raised on direct appeal. (*Compare* Pet. at 4-5, ¶ 21 *with* App. Br. at 14-38 *and* Pro Se Br. at 4-13). In response to the Court's July 25, 2013 Order to Show Cause (Dkt. 5), Respondent filed an affirmation of Assistant District Attorney Grazia DiVincenzo, Esq., dated September 17, 2013 (Dkt. 8 at 1-9) and a memorandum of law in opposition to the petition, dated September 17, 2013 (Dkt. 8 at 10-26).

On December 16, 2013, Romero moved this Court to stay the present proceedings in order to allow him to, *inter alia*, exhaust his ineffective assistance claims premised (at least in part) on matters not appearing in state the trial court record by filing a motion to vacate his sentence in the state trial court pursuant to CPL § 440.10. (Dkt. 11). On January 7, 2014, Respondent opposed that motion (Dkt. 12), and on February 4, 2014 Romero filed a reply (Dkt. 13). On September 25, 2014, this Court denied Romero's request for a stay because he had not demonstrated any cause, much less good cause, for failing to exhaust his ineffective assistance

claims through a CPL § 440.10 motion prior to filing his federal habeas petition, as required under *Rhines v. Weber*, 544 U.S. 269, 277 (2005).   (Dkt. 15).

## II.   FEDERAL HABEAS CORPUS STANDARDS

"[A] district court shall entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).   In order to obtain habeas relief, § 2254 petitioner must generally show: (i) that he exhausted his state court remedies; (ii) that he raised his federal claims in the state courts in compliance with state procedural rules; and (iii) that his claims overcome the deferential standard of review prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).

### A.   Exhaustion

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that … the applicant has exhausted the remedies available in the courts of the State."   28 U.S.C. § 2254(b)(1).   Claims are exhausted only where the petitioner presented to the state court "both the factual and legal premises of the claim he asserts in federal court."   *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).   Prior to the institution of AEDPA and its attendant one (1)-year statute of limitations, the "total exhaustion" rule required "a district court [to] *dismiss* habeas petitions containing both unexhausted and exhausted claims."   *Rose v. Lundy*, 455 U.S. 509, 522 (1982) (emphasis added).   Post-AEDPA, district courts "may *deny* an entire habeas petition on the merits notwithstanding the petitioner's failure to exhaust some or all of his claims."   *Pearson v. Rock*, No. 12-cv-3505, 2015 WL 4509610, *6 (E.D.N.Y. July 24, 2015)

(citing 28 U.S.C. § 2254(b)(2)) (emphasis in original); *see also Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 381 (E.D.N.Y. 2013) ("Federal courts … may deny unexhausted claims that are plainly without merit.") (internal citations omitted). "In other words, a court may deny but not grant 'mixed petitions' on the merits." *Pearson*, 2015 WL 4509610, at *6 (internal citations omitted).

### B.    Procedural Default

"It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (internal quotations and citations omitted). "[C]onsistent with the longstanding requirement that habeas petitioners must exhaust available state remedies before seeking relief in federal court, … when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Id.* (internal citations omitted). The adequacy of the state procedural bar, however, is a federal question. *See id.* (citing *Lee v. Kemna*, 534 U.S. 362, 375 (2002). Thus, federal habeas courts "have an independent duty to scrutinize the applications of state rules that bar [their] review of federal claims." *Id.* at 468 (citing *Lee*, 534 U.S. at 375).

A district court may nonetheless consider a habeas petitioner's claim that is otherwise barred by state procedural rules if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "Cause" means that "some objective factor external to the defense

impeded counsel's efforts to comply with the State's procedural rule." *Fernandez v. Smith*, 558 F. Supp. 2d 480, 490 (S.D.N.Y. 2008) (quoting *Murray v. Carrier*, 477 U.S. 479 (1986)). "Prejudice" means that the procedural default "result[ed] in 'actual' injury and cause[d] a 'substantial disadvantage, infecting the entire trial with error of constitutional dimensions.'" *Petronio v. Walsh*, 736 F. Supp. 2d 640, 654 (E.D.N.Y. 2010) (quoting *Carrier*, 477 U.S. at 494). Finally, under the "fundamental miscarriage of justice" exception, a petitioner may avoid the preclusive effects of a procedural default if he can show that "he is actually innocent of the crime for which he has been convicted." *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321 (1995) and *Carrier*, 477 U.S. at 496). In this context, " '[a]ctual innocence means factual innocence, not mere legal insufficiency.' " *Id.* (quoting *Bousley v. U.S.*, 523 U.S. 614, 623 (1998)).

### D.  AEDPA Deference

Where a habeas petitioner challenges a state court's merits-based ruling, the federal district court reviews the state court's decision under the deferential AEDPA standard:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established federal law refers to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v.*

*Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (internal citations omitted). The phrase "contrary to" means that "the state court arrive[d] at a conclusion opposite that reached by [the Supreme] Court on a question of law or if the state court decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The phrase "unreasonable application" means that "the state court identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the petitioner's case." *Id.* at 413. The question is "not whether the state court was incorrect or erroneous in rejecting petitioner's claim, but whether it was objectively unreasonable in doing so." *Ryan v. Miller*, 303 F.3d 231, 245 (2d Cir. 2002) (internal quotations, alterations, and emphases omitted). A habeas petition may only be granted where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Finally, "a determination of a factual issue made by a State court [is] presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## III.    DISCUSSION

### A.    Alleged Trial Court Errors

Romero claims that the trial court committed two (2) reversible errors: (1) in response to the jurors' note posing the question of "what happens if we can't reach an agreement," Judge Weber failed to provide the jury with an *Allen* charge and "conveyed to the jury that it was obligated to return with a verdict"; and (2) Judge Weber "incorrectly provided the jury with the consciousness of guilt instruction thereby improperly supplanting the fact finding function of the jury on the issue of identification."   (Pet. at 5).

### 1.    Failure to Provide Jury with *Allen* Charge

On direct appeal, Romero argued that the trial court committed reversible error when, in response to a note from jurors posing the question of "what happens if we can't reach an agreement," Judge Weber "failed to give the jury the required *Allen* charge which was constructed for such a situation" and made a statement that "had the effect of coercing the jury to reach a verdict."   (App. Br. at 24-28).   As discussed above, Judge Weber reviewed his proposed response to the jurors' note with both the prosecution and Romero's trial counsel prior to issuing that response to the jury, and counsel assented without raising any objections.   In his appellate brief, Romero acknowledged that "these issues were not preserved for appellate review, [but] respectfully requested that [the Appellate Division] consider them in its interest of justice jurisdiction."   (*Id.* at 28).

The Appellate Division rejected Romero's arguments on the basis that they were not preserved for appellate review due to Romero's failure to request an *Allen* charge or to raise a contemporaneous objection to Judge Weber's instruction in response to the jurors' note at trial. *See Romero*, 101 A.D.3d at 906.   The Appellate Division also rejected Romero's *Allen* charge

argument on the merits:

> In any event, an *Allen* charge was not necessary under the circumstances. The jury had only been deliberating for a day and a half when it asked the court what would happen if it could not reach an agreement. The court's instructions in response to the jury's question "merely asked the jury to try to continue deliberating, were not directed to a particular juror and were not coercive" (*People v. Velez*, 150 AD2d at 515).

*Id.* at 906-07.

"[T]he independent and adequate state ground doctrine … applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30. The state procedural requirement that Romero failed to comply with is CPL § 470.05(2), New York's contemporaneous objection rule.[1] New York's contemporaneous objection rule constitutes an independent and adequate state law ground for disposing of a claim. *See, e.g., Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011); *Velazquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990).

The fact that the Appellate Division addressed the merits of Romero's *Allen* charge argument after expressly holding that the argument was not preserved for appellate review does not alter this Court's procedural default conclusion. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding," as the procedural default doctrine "curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.") (emphasis in original); *Green v. Travis*, 414 F.3d 288, 294 (2d Cir.

---

1 CPL § 470.05(2) provides, in pertinent part: "For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." N.Y. Crim. Proc. Law § 470.05(2).

2005) ("[E]ven when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted.") (internal citations omitted).   Accordingly, Romero's *Allen* charge and jury coercion arguments are procedurally defaulted, and this Court will not address the merits of those arguments.

### 2.   The "Consciousness of Guilt" Instruction

On direct appeal, Romero argued that the trial court committed reversible error when Judge Weber provided the jury with the "consciousness of guilt" instruction discussed above (*supra at* § I(B)(1)).   (App. Br. at 29-33).   Romero argued that the instruction "was incorrect as there was an insufficient factual predicate to necessitate such a charge" (*id.* at 31), and that it "created the presumption that it was [Romero] who was followed by Mr. Leon from the Mi Ranchito restaurant and had the effect of improperly supplanting the fact-finding function of the jury on the issue of identification."   (*Id.* at 32) (internal quotations omitted).   In his appellate brief, Romero acknowledged that "this issue was not preserved for appellate review, [but] respectfully requested that [the Appellate Division] consider it pursuant to its interest of justice jurisdiction."   (*Id.* at 33).

The Appellate Division rejected Romero's argument regarding Judge Weber's "consciousness of guilt" instruction on the ground that it was not preserved for appellate review due to Romero's failure to contemporaneously object to the instruction in accordance with CPL § 470.05(2), and held that it was "in any event, without merit."   *Romero*, 101 A.D.3d at 907. Accordingly, Romero's argument regarding the trial court's "consciousness of guilt" instruction is procedurally barred for the same reasons that his *Allen* charge / jury coercion argument is procedurally barred, and this Court similarly will not address the merits of this argument.

**B.     Alleged Insufficiency of Evidence**

Romero argues that his "conviction for robbery in the first degree should be reversed as the [P]eople failed to prove him guilty beyond a reasonable [doubt] and his conviction was against the weight of the evidence[,] or in the alternative [that his] conviction should be modified to a lesser included offense of robbery in the second degree."  (Pet. at 4-5).   Romero raised the same argument on direct appeal (App. Br. at 20-23), and the Appellate Division held that the legal insufficiency argument was unpreserved for appellate review due to Romero's failure to contemporaneously raise the argument in the trial court pursuant to CPL 470.05(2).   *Romero*, 101 A.D.3d at 906.   The Appellate Division further held:

> In any event, viewing the evidence in the light most favorable to the prosecution (*see People v. Contes*, 60 NY2d 620, 621 [1983]), we find that it was legally sufficient to establish [Romero's] guilt beyond a reasonable doubt.   Moreover, upon our independent review pursuant to CPL 470.15 (5), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v. Romero*, 7 NY3d 633 [2006]).

*Id.*

Romero's argument regarding the purported insufficiency of the evidence supporting his conviction is procedurally barred for the same reasons that his arguments regarding purported reversible errors by the trial court are procedurally barred, and this Court will not evaluate the merits of his insufficiency argument.[2]

---

2 Regardless of the procedural default, claims concerning sufficiency of the evidence are "essentially … question[s] of state law and do[ ] not rise to federal constitutional dimensions … absent a record so totally devoid of evidentiary support that a due process issue is raised."   *Mapp v. Warden, N.Y. State Corr. Inst. for Women*, 531 F.2d 1167, 1173 n.8 (2d Cir. 1976).   The state trial court record contains ample evidentiary support for Romero's conviction, so that is not the case here.

### C.    Allegedly Harsh and Excessive Sentence

Romero argues that the "sentence imposed by the court of twenty years was harsh and excessive."  (Pet. at 5).   He raised the same argument on direct appeal (App. Br. at 34-38), specifically arguing that "the sentence imposed by the trial court of twenty years imprisonment, which was two and half times greater than the eight year minimum sentence permitted by the Penal Law and four times greater than that offered to [Romero] pre-trial, was punishment for [Romero] having exercised his constitutional right to a jury trial."  (*Id.* at 37).   The Appellate Division held:

> [Romero] failed to preserve for appellate review his contention that the sentence imposed by the trial court improperly penalized him for exercising his right to a jury trial, because he did not set forth the issue on the record at the time of sentencing (*see People v. Hurley*, 75 NY2d 887, 888 [1990]; *People v. Garcia*, 66 AD3d 699 [2009]; *People v. Norris*, 34 AD3d 500, 501 [2006]; *People v. Best*, 295 AD2d 441, 441 [2002]).   In any event, the contention is without merit.   "The fact that the sentence imposed after trial was greater than the sentence offered during plea negotiations is not, standing alone, an indication that the defendant was punished for asserting his right to proceed to trial" (*People v. Griffin*, 98 AD3d 688, 690 [2012]; *see People v. DeCampoamor*, 91 AD3d 669, 672 [2012]; *People v. Jimenez*, 84 AD3d 1268, 1269 [2011]; *People v. Givhan*, 78 AD3d 730, 731-732 [2010]).   Moreover, the sentence imposed was not excessive (*see People v. Suitte*, 90 AD2d 80 [1982]).

*Romero*, 101 A.D.3d at 907.

Given the Appellate Division's determination that Romero failed to preserve his argument regarding the purported harshness, excessiveness, and/or vindictiveness of his sentence for appellate review, the argument is procedurally barred and this Court will not evaluate the merits.[3]

### D. Alleged Ineffective Assistance of Trial Counsel

Romero claims that his trial counsel provided him with ineffective assistance in violation of the Sixth Amendment, as applied to the states through the Fourteenth Amendment. (Pet. at 4-5). Specifically, Romero argues that his trial counsel was ineffective because he failed to: (1) request that the jury be instructed on the affirmative defense to the charge of first degree robbery that the gun Romero displayed was not a loaded weapon capable of producing death or other serious physical injury; (2) request the lesser-included charge of second degree robbery or consult with Romero before making that decision; (3) preserve a claim of evidentiary insufficiency; (4) object to Judge Weber's allegedly "coercive" comments in response to the jurors' note posing the question of "what happens if we can't reach an agreement"; (5) object to Judge Weber's "consciousness of guilt" instruction; and (6) object to the trial court's purported "imposition of a particularly harsh sentence solely because the defendant elected to proceed to trial." (*Id.*). Romero raised these arguments on direct appeal (*see* App. Br. at 14-19; Pro Se Br. at 4-13), and the Appellate Division found these arguments to be either (i) inappropriate for direct appeal because they were based on matters not appearing in the trial court record and thus

---

3 In any event, the sentence imposed by Judge Weber was within the range prescribed by New York State law, and thus presents no federal constitutional issue for this Court to consider. *See, e.g., White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law.") (internal citations omitted); *Mungo v. Duncan*, 277 F. Supp. 2d 176, 184-85 (E.D.N.Y. 2003) ("A challenge to the term of a sentence is not a cognizable constitutional issue if the sentence falls within the statutory range.") (internal citations omitted).

more suited for a CPL 440.10 motion in the trial court, or (ii) without merit. *Romero*, 101 A.D. 3d at 907 ("it is not evident from the matter appearing on the record that [Romero] was deprived of the effective assistance of counsel"). Romero has not pursued his ineffective assistance claims in the trial court through a CPL § 440.10 motion. (Pet. at 4, ¶ 20).

### 1.    The *Strickland* Standard

Ineffective assistance of counsel claims are governed by the two (2)-pronged test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland*, 466 U.S. at 687.

Under *Strickland's* first "deficient performance" prong, a petitioner must show that trial counsel's representation "fell below an objective standard of reasonableness," as measured against "prevailing professional norms." *Id.* at 688. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Reviewing courts are to "apply a heavy measure of deference to counsel's judgments … [and should] not normally fault counsel for

foregoing a course of conduct if that choice also entails a significant potential downside." *Greiner*, 417 F.3d at 319 (internal quotations omitted). "Thus, a lawyer's decision not to pursue a defense does not constitute deficient performance if … the lawyer has a reasonable justification for the decision." *Id.* (internal quotations and alterations omitted).

Under *Strickland's* second "prejudice" prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

### 2. Application to Romero's Ineffective Assistance Claims

#### a. Failure to request "affirmative defense" and "lesser included charge" instructions

Romero raises the interrelated arguments that his trial counsel was ineffective because he failed to (i) request that the trial court instruct the jury on the affirmative defense to first degree robbery that the object displayed in the commission of the robbery was not a loaded weapon capable of producing death or other serious physical injury,[4] and (ii) request that the trial court instruct the jury on the "lesser included charge" of second degree robbery or consult with Romero prior to making that decision. (Pet. at 4-5, Grounds 1 and 6(a); App. Br. at 14-19; Pro Se Br. at 4-9).

---

4 New York Penal Law § 160.15 provides in pertinent part: "A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: … 4. Displays what appears to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude conviction of, robbery in the second degree, robbery in the third degree or any other crime." N.Y. Penal Law § 160.15(4).

As Romero noted in his appellate brief on direct appeal, his trial strategy was to "maintain[ ] that he did not commit the crime and was the victim of mistaken identity." (App. Br. at 18). Indeed, Romero maintained this position through sentencing. (*See* 1/14 Tr. at 11:12-16) ("I feel bad for what everyone had to go through but I still say that I did not do this. What that young lady and her husband said this against me, they were wrong."). Having elected to pursue a defense of innocence and misidentification, trial counsel's decision to forgo the inconsistent argument that Romero did in fact commit the robbery, albeit with a fake gun, did not constitute deficient performance under *Strickland*. As the New York Court of Appeals has recognized, pursuing contradictory defenses is not forbidden, but "it is plainly a hazardous tactic, for it not only risks confusing the jury as to the nature of the defense but also may well taint a defendant's credibility in the eyes of the jury." *People v. DeGina*, 72 N.Y.2d 768, 777 (N.Y. 1988); *see also People v. Stokes*, 25 A.D.3d 332, 333 (1st Dep't 2006) ("use of the affirmative defense under Penal Law § 160.15 (4) poses the danger of undermining a defendant's misidentification defense"). Trial counsel's purported "failure" to pursue a "hazardous tactic" is no failure at all.

Romero also argues that his trial counsel was ineffective because he neglected to "consult with [Romero] prior to making [the] decision" not to request jury instructions concerning the fake gun affirmative defense and second degree robbery. Even if better practice would have been for trial counsel to discuss his decision not to request affirmative defense and "lesser included charge" instructions with Romero (assuming he did not), the New York Court of Appeals has held that the decision regarding whether or not to request a "lesser included charge" instruction is ultimately the attorney's, not the defendant's, to make. *People v. Colville*, 20 N.Y.3d 20 (2012). Thus, even if Romero had objected to trial counsel's decision not to pursue

contradictory misidentification and "lesser included charge" strategies, trial counsel would have been obligated to pursue the strategy that he, in his own professional judgment, believed had the highest likelihood of success, notwithstanding Romero's disagreement.

Furthermore, Romero is not able to show that trial counsel's failure to request affirmative defense and lesser included charge instructions prejudiced him within the meaning of *Strickland*. Romero claimed to have disposed of the weapon after fleeing Mi Ranchito and the police failed to find it in the location that Romero directed them to, so there was no factual basis for a "fake gun" affirmative defense apart from Romero's own self-serving assertions. *See Stokes*, 25 A.D.3d at 333 ("There is no reason to believe that counsel could have established a factual basis for this affirmative defense … [where] this defendant had ample opportunity to dispose of a weapon before being apprehended.").

In sum, trial counsel's purported failures to (i) pursue a contradictory affirmative defense, (ii) request that the jury be instructed on second degree robbery in connection with that contradictory affirmative defense, or (iii) discuss the foregoing with Romero do not give rise to a viable ineffective assistance claim. Accordingly, this branch of Romero's ineffective assistance claim is denied.

### b.    Romero's remaining ineffective assistance claims

Romero claims that trial counsel was ineffective because he failed to: (i) preserve a claim of evidentiary insufficiency; (ii) object to Judge Weber's "coercive comments" in response to the jurors' note posing the question of "what happens if we can't reach an agreement"; (iii) object to Judge Weber's "consciousness of guilt" instruction; and (iv) object to the trial court's purported "imposition of a particularly harsh sentence solely because the defendant elected to proceed to trial." The Appellate Division rejected Romero's underlying evidentiary sufficiency, *Allen*

charge, "consciousness of guilt" instruction, and "harsh sentence" arguments both on procedural grounds and on the merits.   *See Romero*, 101 A.D.3d at 906-07.   The end result would have been the same even if trial counsel had made these objections and Romero therefore cannot establish "prejudice" under *Strickland*.   Accordingly, these ineffective assistance claims are also denied.

**IV.      CONCLUSION**

For the foregoing reasons, Romero's petition for a writ of habeas corpus is denied. Because Romero has not made a substantial showing of the denial of a constitutional right, no certificate of appealability shall issue.   Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that an appeal from this judgment would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of any appeal.   *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).   The Clerk of the Court is respectfully requested to enter judgment and close this case.


**SO ORDERED.**


                                        *s/ Sandra J. Feuerstein*
                                        Sandra J. Feuerstein
                                        United States District Judge


Dated: June 21, 2016
        Central Islip, New York